UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Magdi R. Sawiers,                                             Civil No. 04-4655 (DWF/AJB)

                Plaintiff,

v.                                                                 **MEMORANDUM**
                                                                       **OPINION AND ORDER**

Qwest Disability Services, Inc.,

                Defendant.

___

Robert J. Leighton, Jr., Esq., and Mark M. Nolan Esq., Nolan MacGregor Thompson & Leighton, counsel for Plaintiff.

Thomas M. Affolter, Esq., and Donald W. Heyrich, Esq., Perkins Coie, Bradley J. Lindeman, Esq., Meagher & Geer, PLLP counsel for Defendant.

___

**Introduction**

The above-entitled matter came before the undersigned United States District Court Judge on December 9, 2005, pursuant to the parties' cross-motions for summary judgment. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted; Plaintiff's Motion for Summary Judgment is denied.

**Background**

Plaintiff Magdi R. Sawiers brought this action against Defendant Qwest Disability Services, Inc. ("Qwest") to challenge Qwest's denial of Sawiers' request for long-term disability ("LTD") benefits. Sawiers was employed as a telephone technician at the time of his alleged disability. While working for Qwest, Sawiers was insured under the Qwest Disability Plan (the "Plan"). The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

**1.     The Plan**

Under the terms of the Plan, Sawiers was eligible for LTD benefits if he exhausted his eligibility for short-term disability benefits and continued to satisfy the definition of "Disabled." (Declaration of Jennifer Whitehurst in Support of Defendant's Motion for Summary Judgment at ¶ 4, Ex. A, Administrative Record ("AR") at 0347.) The Policy defined "Disabled" or "Disability" as follows:

> "Disabled" or "Disability" means the circumstance when a Participant is unable to perform the normal duties of his regular job or other job duties in a modified capacity due to an injury or illness which is supported by objective medical documentation. During the first 12 months a Participant receives Long Term Disability Benefits, Disability means a Participant is unable to perform their last Company assigned job. After receiving LTD benefits for 12 months, Disability means a Participant is unable to engage in any occupation or employment for which the Participant is qualified, or may reasonably become qualified for by training, education or experience, other than a job that pays less than 60% of his Base Pay at the time the Participant became Disabled.

(*Id.*)

The policy further provides that participants shall be eligible for LTD benefit payments under the Plan if they are Disabled and they fulfill all of the following requirements and obligations:

(i)     Seek proper care and treatment from an Approved Provider, and follow a recommended treatment plan;

(ii)    Provide documentation supporting their Disability to the LTD Administrator upon request. Documentation must support the claim for Disability and include Objective Findings, diagnosis and any other information relevant to the nature and duration of the Disability, as well as a plan for treatment or management of the problem; and

(iii)   Report for medical or psychological examinations from time to time, at the request of the LTD Administrator or the Plan Administrator, for the purpose of determining the Participant's condition. LTD benefits may be suspended if a Participant and/or the Participant's Approved Provider fails to satisfy any of these requirements.

(AR at 0365–66.)

The Plan provides that any plan administrator has full authority to interpret the Plan and make determinations regarding eligibility for benefits:

> [The Plan administrator] shall have such authority and powers, as may be necessary or appropriate to enable it to administer the Plan. Such authority and powers shall include, but are not limited to full discretion and power to: (1) interpret the Plan; (ii) determine the eligibility, status and rights of all persons under the Plan; (iii) review and grant or deny benefit claims and/or appeals under the Plan; (iv) appoint a Secretary and such assistants as may be required in the administration of the Plan . . . .

(AR at 0386.) The Plan further grants Qwest the right to delegate this authority to a third-party administrator. (*Id.*) The Plan states that the third-party administrator "shall have the . . . discretion to determine . . . all matters of fact or interpretation relating to the administration of the Plan provisions, including questions of eligibility." (AR at 0387.) The Plan also states that the third-party administrator's decisions "shall be conclusive and binding on all persons subject only to the right to appeal." (*Id.*)

In 2001, Qwest delegated claims administration to a third-party administrator, Sedgwick CMS. In April 2004, Sedgwick CMS was replaced by another third-party administrator, The Reed Group. Both Sedgwick CMS and The Reed Group administered claims under the name "Qwest Disability Services."

### 2. Sawiers' Medical History

On November 9, 2000, Sawiers, while on the job, fell 15-18 feet off a ladder, landing on his head. Sawiers sustained "a severe traumatic brain injury with multiple cognitive deficits." (AR at 0025.) He also sustained "a right clavicle fracture, a left radius fracture and multiple facial fractures with the

3

facial and radius fracture requiring surgical fixation." (*Id.*)  On January 4, 2001, Dr. Rebecca M. Koerner stated that Sawiers should not be home alone and should not return to work.  (AR at 0017–18.)

By December 27, 2002, in response to the Plan's request for an update on Sawiers' health, Sawiers' treating physician, Dr. Samuel Seltz, indicated that Sawiers condition had "improved," his mental condition was "satisfactory," and that he was not "totally disabled for any occupation."  (AR at 0099.)  Dr. Seltz also indicated that Sawiers could resume working with the permanent restrictions of no crawling, only occasional bending, occasional reaching above shoulders, no lifting more than 25 pounds, and no pushing or pulling more than 50 pounds.  (*Id.*)

On February 25, 2003, Dr. Bruce Van Dyne issued a report after conducting an independent medical evaluation ("IME") and reviewing Sawiers' medical records.  Dr. Van Dyne conceded that Sawiers suffered a serious head and facial bone injury in 2000, but stated that Sawiers was "capable of a full-time job search and full-time employment."  (AR at 0118.)  Additionally, Dr. Van Dyne stated that, in his opinion, Sawiers was "capable of attending school on a full-time basis and [would not require] any specific restrictions or special adaptations to facilitate his employment or attending school."  (*Id.*)

On April 15 and 16, 2003, Sawiers underwent testing for a Functional Capacity Evaluation ("FCE") to assess whether Sawiers could work and, if so, under what conditions.  (AR at 0130.)  The FCE indicated that Sawiers is "capable of working an 8-hour day in the Medium job classification as defined in the Dictionary of Occupational Titles."  (*Id.*)  Work in the medium job classification includes

4

the ability to lift up to 50 pounds on a rare basis and up to 25 pounds on a frequent basis, even in awkward positions. (*Id.*)

On January 7, 2004, Qwest's Qualified Rehabilitation Consultant ("QRC"), Gregory Irle, indicated in a status report that Sawiers requested that Irle develop a retraining plan and that Sawiers wished to continue looking for work. (AR at 0217.) The report also indicated that Sawiers planned to take classes in accounting and that Sawiers was "in the snowplowing business and that he had 25 customers." (*Id.*)

### 3. Sawiers' Claim for LTD Benefits

After exhausting his short-term disability payments, Sawiers sought LTD benefits. On November 19, 2001, Qwest granted Sawiers' request for LTD payments because several physicians indicated that Sawiers was not able to return to his existing job as a technician. (AR at 0070.) By late 2002, Sawiers had received LTD benefits for one year, and therefore, the definition of disabled changed from an inability to perform his last Company performed job to an inability to "engage in any occupation or employment for which the Participant is qualified or may reasonably become qualified for by training, education or experience, other than a job that pays less than 60% of his Base Pay at the time the Participant became Disabled." (AR at 0347.) At the time of his injury, Sawiers earned $18.00 per hour.[1]

---

1 Sawiers' monthly base pay at the time of his injury was $3,788.85, which means that 60% of that wage is $2,273.31. (AR 0070.)

On April 6, 2004, Qwest denied Sawiers' claim for benefits, finding that Sawiers' was not "totally disabled as defined by the Plan provisions."[2] (AR at 0229.) Qwest relied on documents from office visits with Dr. Seltz, the FCE, Dr. Van Dyne's report, and Irle's January 7, 2004 status report. (*Id.*) On July 16, 2004, Sawiers appealed the denial of his LTD benefits. (AR at 0258.)

In his appeal, Sawiers asserted that three pieces of evidence supported his claim of disability. First, Sawiers provided a letter from Dr. Seltz, asserting that the previous disability form that the Plan administrator gave Dr. Seltz failed to define "disability" under the Plan. In Dr. Seltz's clarifying letter, he stated that "[Sawiers] is disabled from his previous job as a Telephone Technician at Qwest, or in doing similar work for which [Sawiers] has been trained," but that "it may be possible that [Sawiers] could perform certain types of jobs at low pay." (AR at 0253.) Dr. Seltz also reiterated that Sawiers has permanent restrictions, "including no crawling, only occasional bending, occasional reaching above shoulders, no lifting over 25 pounds, and no push/pull over 50 pounds." (*Id.*)

---

2 The procedural history leading to this denial is as follows. On January 6, 2003, Qwest denied Sawiers' claim for LTD benefits, stating that Sawiers was not disabled as defined by the Plan provisions. (AR at 0101.) Sawiers appealed. (AR at 0120.) Qwest reinstated Sawiers' LTD benefits. On December 26, 2003, Qwest again denied Sawiers' LTD benefits, stating that Sawiers had "closed any and all rights under any Qwest employment benefit plan," as a condition of Sawiers' settlement agreement of his workers compensation claim. (AR at 0197.) On February 9, 2004, Qwest provided Sawiers' with a corrected denial letter, indicating that the decision to deny LTD benefits was also based on a determination that Sawiers was not "totally disabled" because he allegedly stated that he is able to work and had a job. (AR at 0206.) Sawiers appealed, asserting that he did not have a permanent job and that he did not release his claims for LTD benefits as part of his settlement agreement. (AR at 0212.) On March 11, 2004, the appeals specialist overturned the denial of benefits because she concluded that Sawiers' did not waive his rights to LTD benefits as a condition of his settlement agreement. (AR at 0223.) The appeals specialist then returned Sawiers' claim for LTD benefits to the original examiner for review based upon the Plan provisions. (*Id.*) Qwest again denied Sawiers' benefits, leading to the current lawsuit.

Sawiers also included a letter from Irle, who asserted that, in his opinion, Sawiers would not be able to find any employment that would pay him 60% or more of his base pay at the time Sawiers originally became disabled. (AR at 0247.) Finally, Sawiers included a letter from Dr. Eric Hahn, who began treating Sawiers' back pain on May 3, 2004. Dr. Hahn stated that Sawiers is not "physically capable of returning to employment as a telephone technician or any other employment that would involve similar skills or physical abilities." Dr. Hahn also stated that Sawiers "may not be precluded from all types of employment," but that Sawiers does have "permanent restrictions that would affect his employability." (AR at 0257.) Sawiers also noted in his appeal that the plan administrator did not indicate what specific jobs Sawiers was capable of performing and never relied upon a Transferable Skills Analysis ("TSA"). (AR at 0259.)

Qwest and Sawiers than agreed to delay the appeal so that Qwest could have a TSA and labor market study performed based on the restrictions provided by Dr. Seltz. (AR at 0290, 0293.) In August 2004, Intracorp, an independent party, issued a TSA and labor market study report that considered Sawiers' past work experience, current skills, intelligence, and his medical restrictions, in determining various jobs for which Sawiers was qualified. (AR at 0296–0299.) The TSA indicated that Sawiers' skills were directly transferable to positions as a retail store manager, parts salesman, sales clerk, or order clerk (AR at 0302–0304.) The TSA also stated that there were other positions available to Sawiers, including security guard, electric motor assembler, or circuit board repairman. (AR at 0304–0305.) The TSA concluded that, "within a reasonable degree of vocational certainty that [Sawiers] maintains sufficient vocational skill transferability to obtain and maintain gainful employment in the area immediately surrounding his home community of Cottage Grove, Minnesota." (AR at 0296.)

The TSA also stated that, given Sawiers' work history and experience, he is "capable of earning mean wages in the $10.85 an hour - $15.89 an hour range." (*Id.*)

Additionally, two doctors reviewed Sawiers' medical records. Dr. Marcus Goldman, a psychiatrist, analyzed Sawiers' file and submitted a report dated September 16, 2004. Dr. Goldman concluded that there is "no data to support any disabling psychiatric illness" and that Sawiers is "psychiatrically functionally able to work in any capacity from 01/01/2004 forward." (AR at 0310.) Dr. Jacqueline Hess, an internist, also reviewed Sawiers' file and issued a report dated September 17, 2004. Dr. Hess concluded that "it is clear that all assessments done to date conclude that this patient is not totally disabled and has been capable of working in some capacity from 01/01/2004 forward." (AR at 0314.) Additionally, Dr. Hess stated that Sawiers "does have ongoing low back pain, but functionality does not preclude him from full-time work." (*Id.*) On September 20, 2004, Qwest denied Sawiers' appeal and upheld the April 6, 2004 denial of LTD benefits. The appeals specialist stated that "there is no evidence to support that you are functionally unable [to] obtain and maintain gainful employment, earning 60% of your original base salary, as of January 1, 2004." (AR at 0316.) The appeals specialist referred to the TSA and the diagnoses of Dr. Goldman and Dr. Hess as support for the decision. (*Id.*)

On November 1, 2004, Sawiers brought this lawsuit, seeking to recover his LTD benefits under ERISA, attorney fees, interest, and costs. In their cross-motions for summary judgment, the parties dispute the standard of review that the Court should apply in its review of Qwest's decision to deny benefits. The parties also dispute whether the record supports Qwest's denial of benefits.

**Discussion**

1. **Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

A participant in an ERISA plan may bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Typically, a court reviews a denial of benefits challenged under § 1132(a)(1)(B) under a *de novo* standard of review. *Firestone Tire & Rubber Co.*

9

*v. Bruch*, 489 U.S. 101, 115 (1989). However, when a plan gives discretionary authority to the plan administrator or reviewing committee to determine eligibility for benefits or to construe the terms of the plan, the Court reviews the decision to deny benefits for an abuse of discretion. *Id.*

Here, the Policy gives the Third-Party Administrator, "full discretion and power" to "interpret the Plan," "determine the eligibility, status and rights of all persons under the Plan," and "review and grant or deny benefits claims and/or appeals under the Plan." (AR at 0386.) This language is sufficient to trigger the "abuse of discretion" standard of review. Sawiers, however, urges the Court to apply a less deferential standard of review pursuant to *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998). In order to obtain this less deferential standard of review, Sawiers "must present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to [him]." *Woo*, 144 F.3d at 1160 (citing *Buttram v. Central States, S.E. & S.W. Areas Health & Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996)). Once a conflict is found, the Court must apply a "sliding scale" approach, taking into account the conflict or procedural irregularity while it applies an abuse of discretion standard of review. *Id.* at 1161.

Sawiers asserts that there is a "presumption of a conflict of interest" because "the employer is both the Plan Administrator and the entity responsible for paying claims." (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of its Motion for Summary Judgment ("Pl's Mem. in Opp.") at 9.) Further, Sawiers asserts that "[t]he fact that Qwest had a third party administrator process the claims does not mitigate a presumption of a conflict of interest." (*Id.*) Even if there is a "presumed" conflict of interest here, Sawiers has not demonstrated how this conflict

has a connection to the substantive decision reached, or how it caused a serious breach of the plan administrator's fiduciary duty.  *See Barnhart v. UNUM Life Ins. Co. of America*, 179 F.3d 583, 588–89 (8th Cir. 1999).

Sawiers also asserts that serious procedural irregularities were connected with Qwest's decision to terminate his benefits.  Sawiers alleges that Qwest's reliance on Dr. Van Dyne's report constitutes a serious procedural irregularity because Dr. Van Dyne performed the IME and medical review for Sawiers' workers compensation claim, which contained a different standard for "disability."  Additionally, Sawiers asserts that Qwest's reliance on two "paper reviews" of Sawiers' medical records, lack of psychological testing, failure to acknowledge Sawiers' alleged deficiency in English, and previous denials of Sawiers' benefits constitute serious procedural irregularities.

While it may be desirable to have a separate IME conducted solely with regard to Sawiers' claim for LTD benefits, the Court does not find that Qwest's reliance on Dr. Van Dyne's report constitutes a serious procedural irregularity.  Here, Sawiers has failed to demonstrate how the differing standards of "disability" render the entire report inapplicable.  Further, the Court does not find that Qwest's reliance on "paper reviews" of Sawiers' medical records constitute a serious procedural irregularity.  While actual medical examinations are generally preferable to "paper reviews," such examinations are not required in every case.  Regardless, Qwest did rely on Dr. Van Dyne's IME, as well as other evidentiary support.  Likewise, Qwest did have Dr. Goldman, a psychiatrist, analyze Sawiers' file and inquire about Sawiers' English language abilities as part of the TSA.  Finally, the fact that Qwest had previously denied and reinstated Sawiers' LTD benefits does not constitute a serious procedural irregularity.

The Court finds that Qwest's decision, although contrary to Sawiers' position, was supported by a thorough review of the record. Because Sawiers has not demonstrated either a connection to Qwest's ultimate decision or a breach of Qwest's fiduciary duty, the Court will review the denial of benefits under an abuse of discretion standard. Under the abuse of discretion standard, the Court looks to whether a "'reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision.'" *Ferrari v. Teachers Ins. and Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002) (quoting *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (emphasis in original)). Reasonableness is evaluated as to "'whether the decision is supported by substantial evidence which is more than a scintilla, but less than a preponderance.'" *Id.* at 807 (quoting *Woo*, 144 F.3d at 1162). The Court considers "only the evidence that was before the plan administrator when the decision was made" and does not substitute its own weighing of the evidence for that of the administrator.[3] *Id.* at 807.

---

[3]  On this basis, the Court will not consider Exhibits A, B, C, and D to the Affidavit of Mark M. Nolan in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Motion for Summary Judgment, as these documents were not included in the Administrative Record before the plan administrator and Sawiers' has not demonstrated good cause to expand the Administrative Record. *See Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998).

### 2.     Qwest's Decision to Deny Sawiers' Claim for LTD Benefits

Sawiers asserts that the record does not support Qwest's denial of benefits. Sawiers asserts that the FCE was erroneous because it exceeded the physical limitations prescribed by Dr. Seltz. Sawiers also asserts that Dr. Van Dyne's opinion concerning Sawiers' disability under the Plan terms was invalid because Dr. Van Dyne conducted the IME and medical review to determine whether Sawiers was disabled pursuant to Sawiers' worker's compensation claim. Sawiers also asserts that Qwest improperly ignored a status report from Irle, dated March 14, 2003, which indicated that Irle had unsuccessfully attempted to find employment for Sawiers since July 2002.

Sawiers further asserts that Dr. Goldman's and Dr. Hess's reviews are invalid because Qwest requested that these doctors review Sawiers' medical file under the wrong "disability" standard. Finally, Sawiers asserts that the TSA is invalid because the physical restrictions on which the TSA relied are unknown. Moreover, Sawiers asserts that the TSA is invalid because the TSA wrongly indicates that Sawiers is able to converse, write, and read English. Sawiers asserts that Intracorp should not have relied on Sawiers estimations of his English skills because Sawiers "has an inflated opinion as to his [English] abilities." (Pl's Mem. in Opp. at 21.)

Qwest, on the other hand, contends that, as a matter of law, the record supports its denial of Sawiers' benefits. Qwest asserts that its reliance on the FCE, Dr. Van Dyne's report, Dr. Hess's report, Dr. Goldman's report, and the TSA and labor market study provide substantial evidence that Sawiers' was not eligible for LTD benefits. Further, Qwest asserts that the evidence to support a decision that Sawiers is disabled is comparatively weak. Qwest contends that Irle did not conduct the exhaustive research into the local labor market that Itracorp did in its TSA and labor market study.

Qwest also asserts that the letters from Dr. Seltz and Dr. Hahn were confusing and equivocal because neither doctor suggested that Sawiers was incapable of performing some type of employment given his restrictions. Finally, Qwest asserts that, even if Sawiers' treating physicians unequivocally held that Sawiers was disabled, the Plan does not have to defer to these conclusions under *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

  The Court finds that, on this evidence, a reasonable person could have reached the decision to deny Sawiers' LTD benefits. Sawiers' assertion that the FCE was invalid is unpersuasive. The FCE determined Sawiers' physical abilities after two days of testing Therefore, the FCE was conducted independently of Dr. Seltz's determinations and was not required to rely on Dr. Seltz's conclusions. Furthermore, the FCE did not come to vastly different conclusions about Sawiers' physical limitations than did Dr. Seltz. Dr. Seltz restricted Sawiers from crawling and lifting over 25 pounds and pushing or pulling over 50 pounds, and permitted only occasional bending and lifting above the shoulders. In comparison, the FCE concluded that Sawiers could work up to eight hours per day in a "medium" job classification, which could require the ability to lift 25 pounds frequently and 50 pounds rarely. Nonetheless, the Court finds that the FCE was not invalid to the extent that it came to a different conclusion than Dr. Seltz because the FCE was based on extensive independent testing of Sawiers' physical abilities.

  Likewise, the Court finds that Dr. Van Dyne's report is not invalid because Dr. Van Dyne conducted an IME and review of Sawiers' medical records as part of Sawiers' workers compensation claim. While a different definition of "disability," may signal that Dr. Van Dyne's report should be read in its context, Sawiers has not demonstrated how the difference in standards renders the report invalid.

Furthermore, Dr. Van Dyne's conclusion that Sawiers was "capable of a full-time job search and full-time employment" is not inconsistent with Dr. Seltz's, Dr. Hahn's, or Irle's conclusions.

Additionally, Dr. Goldman's and Dr. Hess's reviews are not invalid because Qwest instructed these doctors to review Sawiers' file to determine if Sawiers was "functionally unable to work in any capacity." The question posed was not inconsistent with the Plan's definition of "disability," which means "a Participant is unable to engage in any occupation or employment for which the Participant is qualified or may reasonably become qualified for by training, education or experience, other than a job that pays less than 60% of his Base Pay at the time the Participant became Disabled." (AR at 0347.) As a threshold matter, Qwest needed to determine whether Sawiers was unable to work in any capacity. Once it was determined that Sawiers could, indeed work in some capacity, Qwest needed to determine the more narrow question of whether Sawiers was qualified or could reasonably become qualified by training, education, or experience, for a job that pays 60% or more of his base pay as a telephone technician. The TSA and labor market study addressed this second question. Indeed, Sawiers criticized Qwest for not initially having a TSA performed and agreed to delay his appeal so that Qwest could obtain a TSA and labor market study. Therefore, while Qwest did not supply Drs. Hess and Goldman with the entire definition of "disability," the Court finds that the doctors' reports are relevant.

Further, Sawiers' allegation that the TSA is invalid also fails. Sawiers' allegation that it is unclear what documents were provided to Intracorp in preparing the TSA is unsupported by the record. The record indicates that Intracorp was provided with Dr. Seltz's medical restrictions. (See AR at 0290 and 0316.) Moreover, the TSA relied on physical restrictions consistent with those of Dr. Seltz,

15

stating that Sawiers is restricted to "light" physical demands that require him to "Exert force to 20 lbs. occasionally or 10 lbs. frequently, or negligible force constantly. May involve significant stand/walk/push/pull." (AR at 0302.) Additionally, the Court finds no merit in Sawiers' allegation that the TSA is flawed because it assumes that Sawiers is able to speak, write, and read English. Sawiers, himself, told Intracorp's representative that he could speak, write, and read English. The Court does not find fault with Intracorp's reliance on Sawiers' representations about his English ability.

The Court finds that, at best, Sawiers has shown that Qwest had some potentially conflicting evidence regarding Sawiers' capacity to become employed in a job that pays 60% or more of his base pay as telephone technician. While Irle's conclusions support a determination that Sawiers was disabled, Drs. Seltz's and Hahn's conclusions do not conflict with the determination that Sawiers was not disabled. Both doctors concluded that Sawiers was capable of obtaining some type of employment, despite Sawiers' physical restrictions. Based upon these considerations, the Court finds that, as a matter of law, Qwest's determination to deny benefits was not an abuse of discretion. Thus, Qwest's motion for summary judgment is granted; Sawiers' motion for summary judgment is denied.

## Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment (Doc. No. 12) is **GRANTED**.

2.    Plaintiff's Motion for Summary Judgment (Doc. No. 19) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 8, 2006          s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 Judge of United States District Court